UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 10-64-DLB

SAM GRIPPA                                                                                       PLAINTIFF

vs.                              MEMORANDUM OPINION & ORDER

ST. ELIZABETH MEDICAL CENTER, INC.,
d/b/a St. Elizabeth Imaging Center
d/b/a Kentucky Diagnostic Center                                                        DEFENDANT

* * * * * * * * *

This matter is before the Court on Defendant St. Elizabeth Medical Center, Inc.'s Motion for Summary Judgment (Doc. # 59). This motion has been fully briefed by the parties (Docs. # 63, 69). On January 24, 2012, the Court conducted oral argument in which both parties offered further support for their respective positions. The matter is now ripe for review. For the reasons set forth below, Defendant's motion is **granted in part** and **denied in part**.

I.   **Factual and Procedural History**

Plaintiff Sam Grippa began working at Kentucky Diagnostic Center ("KDC") in 1987, and by 1999 had risen to the position of president and CEO. Through a Management Services Agreement between KDC and TransCare of Kentucky, Inc. ("TransCare"), Plaintiff also served as a chief executive of TransCare beginning in 2001.

1

Plaintiff worked under several written employment agreements during his tenure as President and CEO of KDC, each lasting two years and containing much the same terms.[1] Most notably, the agreements contained identical terms governing the termination of the employment relationship by either party. The agreements granted both parties the right to terminate the relationship without cause by providing written notice to the other party at least 180 days prior to separation. (Doc. # 57-8 at 2). The terms further provided that the employer had the right to terminate the agreement "immediately upon written notice to Employee, if such termination is for cause." (*Id.* at 3). The agreements then defined what amounts to the term "cause" for these purposes, listing six factually specific circumstances. (*Id.* at 3). Plaintiff's most recent executed employment agreement expired on December 31, 2006. A subsequent agreement, written to be retroactively effective as of January 1, 2007 and set to expire on December 31, 2009, was drafted but was never signed.

KDC also had a written Code of Conduct which was distributed to employees accompanied by a cover letter signed by Plaintiff urging "that all those associated with [KDC] understand their responsibility for complying with these laws and regulations and specifically for their responsibility as part of the Corporate Compliance Program." (Doc. # 57-24). The Code of Conduct contained a 'Drug Free Workplace' policy stating, in relevant part, that "[r]eporting to work under the influence of any illegal drug or alcohol, having an illegal drug in your system, or using, possessing, or selling illegal drugs while on work time or property may result in immediate termination." (*Id.* at 3). In addition to signing the cover letter as "President and Chief Executive Officer," Plaintiff also signed a copy of the Code

---

[1] The only terms which were altered in subsequent agreements were Plaintiff's compensation and the addition of duties associated with his role at Transcare. (*See* Doc. # 57-3 through -9).

of Conduct expressing that he "understand[s] that the *Code of Conduct* and Corporate Compliance Program are mandatory policies of [KDC], and [that he] agree[s] to abide by them." (Doc. # 57-24 at 1, 4).

The events leading up to Plaintiff's termination began in March 2008. Plaintiff had previously admitted his use of illegal drugs and attendance at an outpatient rehabilitation program to a few of his co-workers. On March 13, 2008, two of these individuals approached Marc Hoffman ("Hoffman"), a member of both the KDC and TransCare Boards, and informed him of Plaintiff's illegal drug use. Per Hoffman's request, Plaintiff was brought before the Board of Directors of both KDC and TransCare the following day to fully disclose the situation. According to Board members and Plaintiff's testimony, Plaintiff admitted to the use of marijuana, but "believed" that he would not test positive for cocaine, reporting that he "was not using drugs at that time." (Doc. # 57-1 at 27).[2] At the conclusion of the meeting, Plaintiff was asked to undergo a fitness for duty evaluation as well as drug testing and was suspended from work pending the results of the drug test. (Doc. # 63 at 17). The results of Plaintiff's urine test were positive for THC and cocaine metabolites, but negative for cocaine in the active form. (Doc. # 60-1 at 10). Plaintiff's hair test returned positive results for THC, cocaine, and cocaine metabolites. (*Id.* at 9).

The KDC and TransCare Boards decided to terminate Plaintiff, citing the results of the drug test, Plaintiff's alleged dishonesty at the March 14, 2008 Board meeting, and because Plaintiff's conduct was not fit for someone in his position. (Doc. # 59-1 at 9).

---

[2] Plaintiff clarified in his deposition that he did not consider his use of cocaine the prior weekend and marijuana within a couple days prior to the Board meeting as the use of illegal drugs "at that time." (Doc. # 57-1 at 27).

3

Plaintiff was terminated without written notice on March 28, 2008.  (Docs. # 33 at 4; 59-1 at 10).

Plaintiff commenced this civil action on March 26, 2010.  On February 23, 2011, Plaintiff filed an Amended Complaint (Doc. # 33) against Defendants St. Elizabeth Medical Center, Inc. ("SEMC")[3] and TransCare[4] alleging breach of contract and tortious invasion of privacy.  Defendant SEMC filed a Motion for Summary Judgment (Doc. # 59) on June 6, 2011.  On January 24, 2012, the Court conducted oral argument on the Motion.  Attorneys Randolph Freking and Elizabeth Loring appeared on behalf of Plaintiff, who was also present.  Attorneys Robert Hoffer, Kelleene Shoenig, and Nick Birkenhauer appeared on behalf of Defendant SEMC.  At the conclusion of the hearing, the motion was submitted for decision.

## II.   Analysis

### A.   Motion for Summary Judgment Standard

Rule 56(a) entitles a moving party to summary judgment if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(c)(1) further instructs that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

---

[3] SEMC is the successor in interest to KDC, which no longer exists as a separate corporate entity. (See Docs. # 59-1 at 1; 46-1 at 1).  KDC was absorbed into the St. Elizabeth healthcare system pursuant to the merger of SEMC and the St. Luke Hospitals in October 2008.  (Doc. # 59-1 at 2).

[4] TransCare was sold in April 2010 and no longer exists as a corporate entity.  (See Docs. # 49 at 11; 59-1 at 2).  All parties stipulated to dismiss with prejudice all claims brought by Plaintiff against TransCare pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).  (Doc. # 45).

4

In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

    **B.    Breach of Contract**

        **1.    The Existence of a Valid Employment Agreement at the Time of Termination Is Contingent Upon a Disputed Issue of Material Fact**

In his first claim, Plaintiff asserts that Defendant breached the terms of their Employment Agreement by terminating him without providing written notice and an opportunity to cure any alleged breach. (Doc. # 33 at 4). To prevail on a breach of contract claim, it must first be established that a valid contract existed at the time of the alleged breach. Plaintiff argues that the parties were bound by an express written employment agreement that had been drafted, but had yet to be executed. Alternatively, Plaintiff contends that a contract with the same terms as his previous employment agreement arose by implication from the continued performance of both parties after the expiration of the previous agreement. Defendant maintains that no contract was in existence at the time of Plaintiff's termination, and therefore he was an employee subject to termination at-will.

Plaintiff first argues that the parties were bound by an express written contract embodied in the drafted employment agreement. Defendant contends that the agreement cannot create a valid contract pursuant to the statute of frauds as it contemplated a term of employment for more than one year and had not been signed by either party. The Kentucky statute of frauds states, in part, that "[n]o action shall be brought to charge any person . . . upon any agreement that is not to be performed within one year from the making thereof . . . unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith . . . ." K.R.S. § 371.010(7); *see Harrison v. Silver, LLP*, No. 2008-CA-000725-MR, 2009 WL 1744020, at *2 (Ky. Ct. App. June 19, 2009) (holding, in the context of an employment agreement, that "where a contract cannot be performed within a year, the agreement must be in writing and signed by the party to be charged") (citing *Tarry v. Vick*, 283 S.W. 87 (Ky. 1926)). The drafted employment agreement was set to

expire in December 2009, over a year and a half after Plaintiff's termination. Therefore, the contract was incapable of performance within a year, and thus falls within the statute of frauds, requiring the signature of Defendant as the party to be charged. Accordingly, Defendant asserts that any claim brought by Plaintiff based on this unsigned written agreement is barred by the statute of frauds and thereby fails as a matter of law.

Plaintiff alternatively argues that an agreement arose by implication upon the expiration of the prior employment agreement. A contract, whether written, oral, or implied in fact, requires the element of mutual intention by the parties to be bound by the terms of the agreement. *E.g.*, *Cuppy v. Gen. Acc. Fire & Life Assur. Corp.*, 378 S.W.2d 629, 632 (Ky. 1964) (stating that "[e]very contract requires mutual assent"); *Davis v. Davis*, 343 S.W.3d 610, 614 (Ky. Ct. App. 2011) (quoting *Rider v. Combs*, 256 S.W.2d 749, 749 (Ky. 1953) ("To establish a contract implied in fact, the evidence must disclose an actual agreement or meeting of the minds . . . .")). An implied in fact contract permits the required element of mutual assent to be established with reference to "the circumstances, the conduct, and the acts or relations of the parties" rather than looking to written or spoken word alone. *Victor's Ex'r v. Monson*, 283 S.W.2d 175, 176-77 (Ky. 1955); *see Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987) ("A contract implied in fact is a true contract, shown by evidence of facts and circumstances from which a meeting of minds concerning the mutual promises may be reasonably deduced."). Though it is clear that the parties continued in an employment relationship after the expiration of the prior employment agreement, whether both parties intended to remain bound by similar terms is in dispute.

Conflicting evidence has been presented by the parties as to whether each intended to be bound by the terms of the previous employment agreement ("Employment

Agreement") from the expiration of the prior agreement up to and including the time of Plaintiff's termination. In considering a motion for summary judgment, the Court must view the underlying facts drawing all inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (internal quotations omitted). While Defendant argues that the parties were operating under an at-will employment relationship, Plaintiff has presented sufficient evidence for a reasonable jury to conclude that the parties intended to operate under an employment agreement with specific mandatory termination provisions. Thus, whether the parties possessed a mutual intent to be bound by these provisions remains a disputed issue of fact precluding summary judgment in favor of Defendant.

### 2.   Whether KDC's Conduct was Compliant with the Terms of The Employment Agreement

Alternatively, Defendant argues that even if a contract is found to have existed at the time of Plaintiff's termination, KDC complied with the terms of the Employment Agreement in its termination of Plaintiff. Defendant makes three statements to support this contention: (1) Plaintiff breached the employment agreement; (2) KDC had cause to terminate Plaintiff; and (3) Plaintiff was not entitled to the benefit of notice. (*See* Doc. # 59-1 at 12-21). The Court will address each of these defenses in turn.

#### a.   Whether Plaintiff Breached the Employment Agreement

Defendant begins by alleging that if the terms of Plaintiff's Employment Agreement remained in effect after the expiration of the prior agreement, "Plaintiff breached the terms of that agreement in three ways: first, by violating KDC's mandatory drug policy; second, by failing to perform the enumerated duties in his employment agreement; and third, by

failing to devote his full time and best efforts to the operations and management of KDC." (Doc. # 59-1 at 13).

In its Reply, Defendant focuses on the first alleged breach, arguing that the KDC Code of Conduct is incorporated into the terms of Plaintiff's Employment Agreement through the requirement that Plaintiff fulfill his duties and responsibilities "subject to the policies, directions and approval" of KDC. (Doc. # 57-8 at 1). The Drug Free Workplace Policy, found in KDC's Code of Conduct, states that "[r]eporting to work under the influence of any illegal drug or alcohol, having an illegal drug in your system, or using, possessing, or selling illegal drugs while on work time or property may result in immediate termination." (Doc. # 57-24 at 3). When asked during his deposition whether he "reported to work on March 14th, 2008 with illegal drugs in [his] system," Plaintiff answered, "Yes." (Doc. # 57-1 at 20).

Defendant consequently asserts that it is entitled to summary judgement on Plaintiff's breach of contract claim as a result of three facts, which it asserts as follows:

> Section 3 of Plaintiff's employment agreement required Plaintiff to comply with KDC policies;
>
> KDC's Drug Free Workplace Policy provided for the immediate termination of any employee with illegal drugs in his system;
>
> Plaintiff had illegal drugs in his system throughout the course of his employment as CEO of KDC, including on the day of his failed drug test.

(Doc. # 69 at 1). The policies within the Code of Conduct, including the Drug Free Workplace policy, apply to all KDC employees. Although this Code of Conduct, signed by Plaintiff, may constitute additional contractual obligations upon him regarding his duties and responsibilities as an employee, its permissive language regarding potential discipline

9

cannot supersede the unambiguous and mandatory termination provisions of Plaintiff's individually negotiated contract which requires, among other things, written notice.

In Kentucky, "it is a well-settled rule of construction that when interpreting contracts, the definite and precise prevails over the indefinite." *FS Investments, Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 497 (E.D. Ky. 2002) (citing *Int'l Union of Operating Eng'rs v. J.A. Jones Constr. Co.*, 240 S.W.2d 49, 56 (Ky. 1951)); *see also L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994) (stating that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated" (quoting Restatement (Second) of Contracts § 203(c), (d) (1979))). The Employment Agreement outlines very specific mandatory requirements for termination. Even if the policies of the Code of Conduct are incorporated into the terms of the Employment Agreement, the uncertain disciplinary measures within the policies cannot serve to eliminate Plaintiff's entitlement to written notice as required under his individual contract.

### b. Whether KDC Had Cause To Terminate Plaintiff

Defendant further notes that section 6(b) of the Employment Agreement allowed it to immediately terminate Plaintiff for cause, and further asserts that KDC had cause to terminate Plaintiff resulting from his "breaches as well as his ongoing misconduct and general dereliction of his duties." (Doc. # 59-1 at 16). Defendant directs the Court's attention to section 6(b)(vi) of the Employment Agreement, which defines one instance of "cause" as "any other conduct or activity of Employee which Employer determines in good faith jeopardizes the proper operation of Employer's business if such conduct or activity continues to occur after written notice from Employer." (Doc. # 59-1 at 16-17 (quoting Doc.

# 57-8 at 3)). Defendant contends that "KDC's operations were jeopardized by Plaintiff's failure to perform his contractual duties, his illegal drug use, his lack of leadership and absenteeism." (Doc. # 59-1 at 17).

Defendant, however, fails to address the second portion of section 6(b)(vi) which equates such conduct or activity with "cause" only "if such conduct or activity *continues to occur after written notice* from the Employer." (Doc. # 57-8 at 3) (emphasis added). Defendant confirmed during oral argument that no written notice was given. Thus, even if Plaintiff's conduct was determined by the Employer to jeopardize the proper operation of the business, that conduct alone is not sufficient to meet the definition of "cause" under section 6(b)(vi) of the agreement. Furthermore, the agreement may only be immediately terminated for cause upon additional written notice, which Defendant concedes was likewise not provided.

### c. Whether Plaintiff Was Entitled to the Benefit of Notice

Defendant puts forth three reasons to support its assertion that KDC was not required to provide Plaintiff with notice as required pursuant to the terms of the Employment Agreement. Defendant argues that: (1) Plaintiff was not entitled to notice and opportunity to cure because any cure would be futile; (2) KDC was not required to give Plaintiff written notice as a matter of law; and (3) Plaintiff first breached the terms of the agreement, relieving KDC from further performance under the contract. (Doc. # 59-1 at 18-21). Each defense to written notice will be addressed in turn.

### i. Futility of Cure

KDC had "cause" to terminate an employee under section 6(b)(I) of the Employment

11

Agreement when the employee breached a material term of the agreement "if such breach is not cured within ten (10) days after written notice from Employer." (Doc. # 57-8 at 3). Defendant contends that "even if KDC had given Plaintiff written notice and an opportunity to cure following his failed drug test, the illegal drugs would have continued to remain in his system." (Doc. # 59-1 at 18). Defendant argues that as a result, it would have been impossible for Plaintiff to cure his conduct, and therefore notice was not required.

However, even if the Court accepted Defendant's futility argument to permit a finding of cause under section 6(b)(I) of the Employment Agreement, there is another obstacle Defendant neglects to address. Termination of an employee pursuant to section 6(b)(I) ultimately requires two instances of written notice. When one of the six definitions of "cause" for termination has been met under sections 6(b)(I) through (vi) of the Employment Agreement, KDC possessed "the right to terminate this Agreement immediately *upon written notice.*" (Doc. # 57-8 at 3). Defendant acknowledges that this additional written notice requirement has not been met. Therefore, Defendant's argument of futility of cure cannot result in a finding that KDC complied with the terms of the Employment Agreement in its termination of Plaintiff.

## ii.   Notice as a Matter of Law

Defendant argues that Plaintiff is not entitled to the benefit of notice as a matter of law because his conduct "constituted a material breach" of the employment contract. (Doc. # 59-1 at 20). Defendant cites common law from jurisdictions other than Kentucky to support the proposition that an employer is not required to provide contractual notice to an employee prior to termination if the employee has materially breached the employment contract. However, the cases cited by Defendant are distinguishable in two significant

ways.

First, these cases do not address circumstances in which there is a separate for-cause termination provision within the employment contract. Rather, when interpreting the single termination provision within the contracts at issue, the courts found "that such provisions govern *terminations without cause*." *Zhitlovsky v. Valeo Behavioral Health Care, Inc.*, 181 P.3d 589 (Table), 2008 WL 1847814, at *6 (Kan. Ct. App. 2008) (emphasis added). They then clarify that a breaching employee is not entitled to "the notice specified in the contract to which a non-breaching employee would be entitled." (Doc. # 59-1 at 19) (quoting *Chai Mgmt., Inc. v. Leibowitz*, 439 A.2d 34, 40 (Md. Ct. Spec. App. 1982)). The Court does not dispute this reasoning. However, if an employment agreement is found to exist here, it is one that requires notice to be provided to an employee who is terminated with or without cause. It is not a logical extension of the holdings in these cases to find that an employee who is terminated for cause is not entitled to the notice that his contract requires in the context of a for-cause termination.

Second, the courts in these cases equate a material breach of the agreement with "cause" for termination where that term was left undefined by the parties. The terms of the alleged contract here narrowly and specifically define what will constitute "cause" for the purpose of terminating the agreement. Accordingly, these cases provide little guidance in circumstances such as here where there is a separate provision explicitly stated in the employment agreement governing terminations for cause, and providing a narrow definition of "cause" for termination under the agreement. If cause was not otherwise defined within the contract, Defendant's reliance on those cases would be more reasonable. Unfortunately for Defendant, cause is specifically defined and both parties are bound by

13

that definition.

### iii.    Excuse of Performance

Defendant additionally argues that in violating the Drug Free Workplace policy, Plaintiff breached the terms of the Employment Agreement, thereby releasing Defendant from any obligation to further perform under that agreement. Defendant notes that "[u]nder Kentucky law, a breach by one contracting party gives the other party the right to cease performance without being liable for breach." (Doc. # 59-1 at 20) (citing *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956) ("The first party guilty of a breach of contract cannot complain if the other party thereafter refuses to perform.")).  However, Kentucky law has also repeatedly upheld the rights of parties to define the scope of their obligations to one another.  "Generally, the doctrine of freedom to contract prevails and, in the absence of ambiguity, a written instrument will be enforced strictly according to its terms." *Mullins v. Northern Kentucky Inspections, Inc.*, No. 2009-CA-000067-MR, 2010 WL 3447630, at *1 (Ky. Ct. App. Sept. 3, 2010) (citing *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)).

The Employment Agreement specifically contemplates the instance of a breach by Plaintiff as the employee, and under such circumstances imposes further obligations on the part of KDC as the employer. (*See* Doc. # 57-8 at 3).  Thus, even if Plaintiff is found to have breached a "material term" of the agreement, Defendant would not be released from further performance under that contract.  Rather, by the very terms of the agreement as drafted by KDC, upon a breach of any material term, KDC as employer would be required to provide written notice and an opportunity to cure before terminating Plaintiff.  If that breach remained uncured in the time period specified, KDC could then terminate its

agreement with Plaintiff "immediately upon written notice." (*Id.*).

### 3. Conclusion

Drawing all reasonable inferences in favor of Plaintiff as the non-moving party, the Court cannot conclude as a matter of law that an Employment Agreement did not govern the relationship between the parties at the time of Plaintiff's termination. The Court likewise cannot conclude as a matter of law that if the parties were bound by the terms of such a contract, that the conduct of KDC in its termination of Plaintiff was in compliance with those terms. Accordingly, Defendant's motion for summary judgment on Plaintiff's breach of contract claim is **denied**.

### C. Tortious Invasion of Privacy

Plaintiff's second claim alleges that Defendant tortiously invaded his privacy by releasing his private medical information to TransCare without Plaintiff's consent. (Doc. # 33 at 5). Plaintiff contends that only KDC, and not TransCare, was his employer, and therefore it was unnecessary for any employee of TransCare to see the results of his drug test. Thus, when employees of TransCare received this information, it constituted an unlawful publication of Plaintiff's private health information. (*Id.*)

The Supreme Court of Kentucky has adopted the general invasion of privacy principals found in the Restatement (Second) of Torts (1977). *McCall v. Courier-Journal and Louisville Times, Co.*, 623 S.W.2d 882, 887 (Ky.1981). The Restatement § 652A, provides as follows:

> (1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
>
> (2) The right of privacy is invaded by

>  (a) unreasonable intrusion upon the seclusion of another . . .; or
>  (b) appropriation of the other's name or likeness . . .; or
>  (c) unreasonable publicity given to the other's private life . . .; or
>  (d) publicity that unreasonably places the other in a false light before the public . . . .

Restatement (Second) of Torts § 652A (1977). Both parties agree that Plaintiff's allegations fall within the third privacy tort, asserting that "unreasonable publicity" was given to Plaintiff's "private life" through the unwarranted dissemination of his test results. (*Id.*; *see* Docs. # 59-1 at 23; 63 at 32). The Restatement sets forth the elements of this tort as creating liability "if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of a legitimate concern to the public." Restatement (Second) of Torts § 652D.

Defendant asserts that KDC's conduct does not constitute an invasion of Plaintiff's privacy because Plaintiff authorized the release of the information to TransCare, and because the release of the information was only to a small group of people and not to the "public at large." (Doc. # 59-1 at 21).

### 1. A Material Question of Fact Exists as to Whether Plaintiff Expressly Authorized the Release of Test Results to TransCare

Defendant asserts that Plaintiff signed a written authorization allowing the release of his fitness for duty evaluation and drug test results to TransCare. (Doc. # 59-1 at 21-22). Defendant cites a Medical Authorization and Release bearing a copy of Plaintiff's electronic signature. Though Plaintiff admits that it is his signature present on the forms, he denies signing the provisions when he presented himself at SEMC for testing. (Doc. # 57-1 at 32-33). However, notwithstanding this disputed issue of fact, because dissemination was limited to a small number of persons, summary judgment in favor of Defendant on this

16

claim is warranted.

### 2. The Dissemination of Plaintiff's Information to a Limited Group of TransCare Personnel Does Not Amount to 'Unreasonable Publicity'

Defendant additionally argues that the release of the test results to the few employees at TransCare is not sufficient to meet the publicity element of the alleged tortious invasion of privacy. (Doc. # 59 at 23-24); Restatement (Second) of Torts § 652A(2)(c). The Court agrees.

'Publicity' for this purpose has been distinguished from the 'publication' element in a defamation claim. *Id.* at § 652D cmt. a. Although the element of 'publication' in a defamation claim is satisfied if the information is published merely to a third party, 'publicity' here requires that the private information be "passed along in a way substantially certain to become general knowledge either through dissemination to the public at large or to a multitude of persons." *Ghassomians v. Ashland Indep. Sch. Dist.*, 55 F. Supp. 2d 675, 693 (E.D. Ky. 1998) (citing Restatement (Second) of Torts § 652D cmt. a). "Consequently, a communication to a single person or a small group of persons does not constitute publicity." *Id.*

The results of Plaintiff's drug tests were initially released to three employees of St. Elizabeth Business Health Services, who performed Plaintiff's fitness for duty evaluation and drug testing. (Doc. # 59-1 at 24). Defendant asserts that the results were then distributed only to members of the KDC and TransCare Boards and to their legal counsel, all of whom had a "need to know." (*Id.*). Plaintiff's response addresses the publicity element only in reiterating that the information "was made public when it was disclosed to TransCare." (Doc. # 63 at 32). There is no genuine issue of material fact here, as the

17

parties do not dispute that employees of TransCare did receive a communication of Plaintiff's drug test results, and Defendant does not object to the identity of those recipients as specified by Plaintiff.

According to the facts alleged by Plaintiff and consistent with the deposition testimony, the only employees of TransCare who received or discussed this information, beyond those individuals associated with St. Elizabeth Business Health Services mentioned above, were those in its operations and management. This list includes Kelly Beerman, the HR Coordinator, Len Puthoff, the interim President and CEO after Plaintiff's termination, and Judy Arnett, who took over the role of President and CEO of TransCare later that year. (Doc. # 63 at 19-20).[5] This handful of human resource and management personnel can hardly be viewed as "a multitude of persons" and certainly not as "the public at large." See *Ghassomians*, 55 F. Supp. 2d at 693. Because of this limited scope, the dissemination of Plaintiff's information does not rise to the level of the "publicity" required for a tortious invasion of privacy. Therefore, Defendant is entitled to judgment as a matter of law on this claim. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim of tortious invasion of privacy is **granted**.

### III.   Conclusion

For the reasons set forth herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 59) be, and hereby is, **denied** as to breach of contract claim, and **granted** as to the tortious invasion of privacy claim.

---

[5] Defendant noted during oral argument that some of these individuals, including the members of the TransCare Board and Judy Arnett, first learned of Plaintiff's illegal drug use from the Plaintiff directly.

**IT IS FURTHER ORDERED** that not later than ten (10) days from the date of entry of this Order, the parties shall file a Joint Notice of available dates for a final pretrial conference and trial in the spring and summer, 2012. If the parties are interested in participating in a settlement conference before the presiding Magistrate Judge (Smith) in advance of the final pretrial conference, they are instructed to contact the Magistrate Judge's chambers directly.

This 2nd day of February, 2012.



Signed By:
*David L. Bunning*  DB
United States District Judge

G:\DATA\Opinions\Covington\2010\10-64 MOO granting & denying in part D's MSJ.wpd